**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

ALEXANDRA HUNT,
1809 N Wentworth Road
Tucson, AZ 85749

      *Plaintiff,*

    v.

TYLER BYRD
205 Emily Lane
Yorktown, VA 23690

      *Defendant.*

Civil Action No.: 5:26-cv-1306 (ECC/MJK)

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.     On the night of August 12, 2017, Alexandra Hunt (hereafter "Plaintiff-Victim") then a respected senior enlisted member of the United States Air Force, returned to her hotel after dinner and drinks with colleagues. She did not have a roommate, had not shared her room number with anyone, and had no reason to expect any visitors. As Plaintiff-Victim was preparing for sleep, however, Defendant, Tyler Byrd, went to her room and brutally raped the Plaintiff-Victim.

2.     The rape inflicted both immediate and long-term severe bodily harm on Plaintiff-Victim, including genital trauma, hemorrhaging, and surgical interventions. In addition, it irreversibly disrupted Plaintiff-Victim's military and law enforcement career by shattering her personal security and wellbeing. Plaintiff-Victim has medically documented PTSD which requires active and ongoing medical treatment.

3.      Defendant acted intentionally, maliciously, and without consent or justification. Plaintiff-Victim seeks full accountability, and all relief permitted under New York law, including punitive damages warranted for willful, wanton, and morally repugnant intentional torts.

## THE PARTIES

4.      Plaintiff-Victim is a citizen of the United States, and a resident of the state of Arizona.

5.      Defendant, Tyler Byrd, is a citizen of the United States. Upon information and belief, Defendant is a resident of the Commonwealth of Virginia and resides at the address listed in the caption.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction over this civil action under 28 U.S.C. § 1332(a) because: 1) the amount in controversy exceeds $75,000, exclusive of interest and costs; 2) Plaintiff-Victim is a citizen of the State of Arizona; and 3) Defendant is believed to be a citizen of the Commonwealth of Virginia, where he is domiciled. Jurisdiction is proper based on complete diversity of citizenship between the parties and amount in controversy.

7.      Venue is proper in the Northern District of New York under 28 U.S.C. § 1391(b)(2) because the events giving rise to this claim occurred in Watertown, Jefferson County, New York, within this District.

## TIMELINESS OF CLAIMS

8.      Plaintiff-Victim brings claims for physical and psychological injuries arising from conduct that would constitute rape or another qualifying sexual offense under New York law.

9.     New York Civil Practice Law and Rules ("CPLR") § 213-c permits a civil action for physical and psychological injury resulting from conduct that would constitute a qualifying sexual offense to be commenced within the extended limitations period provided by that statute.

10.     Under NY CPLR § 213-c(1), a civil action seeking damages for injury resulting from conduct constituting a qualifying sexual offense may be commenced within 20 years of the date of the injury.

11.     Because the rape occurred in August 2017 and this complaint is filed within 20 years of that act, Plaintiff-Victim's claims are timely.

## STATEMENT OF THE FACTS

12.     Plaintiff-Victim began her military career in January 2009, when she joined the Indiana Army National Guard as an Intelligence Analyst.  Upon completing her undergraduate studies in Criminology and Criminal Justice at Indiana State University in May 2011, Plaintiff-Victim transferred to the Arizona National Guard, where she served in Phoenix, Arizona, until January 2015.

13.     In addition to her military service, beginning in January 2012, Plaintiff-Victim also served in the Tucson Police Department as a Patrol Officer and Hostage Negotiator.

14.     The Tucson Police Department awarded Plaintiff-Victim the Life Saving Medal for Heroism on two occasions: first, for dragging a suicidal man from the path of an oncoming freight train and, second, for reviving a 5-year-old child who had been shot in the head in a gang-related gunfight. As a hostage negotiator, she deescalated critical, life-threatening situations, while also managing criminal and civil incidents with detectives, supervisors, and commanders.

15.      In Spring 2015, Plaintiff-Victim applied for a position with the Air Force Reserves in support of A-10 Formal Training Unit ("FTU") operations. Upon acceptance, she was assigned

to a unit at Davis-Monthan Air Force Base ("AFB") in Tucson, Arizona, with the 924th Operations Support Flight. She served with this unit until she left the Air Force Reserves with an honorable discharge in June 2019. This unit supported the 47th Fighter Squadron by training and educating new A-10 fighter pilots in the Intelligence field.

16.    At Davis-Monthan AFB, Plaintiff-Victim was the Training NCOIC (Non-Commissioned Officer in Charge), responsible for all training and project management for six intelligence specialists in her unit. As Training NCOIC, Plaintiff-Victim also provided briefing and academic support for 35 instructor pilots and approximately 35 student pilots annually.

17.    Throughout her military service, Plaintiff-Victim was a dedicated teammate and leader. She volunteered to be a peer mentor to individuals in her unit facing life challenges, and she taught a required training module on resiliency.

18.    Plaintiff-Victim consistently volunteered for special assignments and extra training. In the Indiana National Guard, she volunteered to help lead a sand bagging crew with Indiana state prisoners during massive flooding. In the Arizona National Guard, she volunteered for extra training to strengthen her leadership abilities for her team, including completing the Company Intelligence Support Team Course.

19.    Plaintiff-Victim met Defendant in 2015 when he, as an A-10 pilot, was a student-trainee at Davis-Monthan AFB, where she was the Training NCOIC.

20.    As with the other student-trainee pilots in the unit, Plaintiff-Victim was responsible for Defendant's education, training, and professional development in the Intelligence field while he was assigned to the 47th Fighter Squadron.

21.    Between their first meeting at Davis-Monthan AFB and the night of the rape in August 2017, Plaintiff-Victim's relationship with Defendant was strictly professional.

22.     In 2017, Plaintiff-Victim was assigned to augment a training unit at Whiteman AFB in Missouri. Defendant was also assigned at Whiteman AFB at that time. Since Plaintiff-Victim knew Defendant from when he was a student-pilot in her unit at David-Monthan AFB, Plaintiff-Victim felt comfortable working with him again at Whiteman AFB.

23.     In August 2017, Plaintiff-Victim, Defendant, and others from their unit at Whiteman AFB were sent to Fort Drum, New York, on a Temporary Duty Assignment ("TDY") to prepare for their unit's upcoming deployment.

24.     In August 2017, Plaintiff-Victim was a Staff Sergeant (E-5) in the USAF Reserves. Defendant was an Active-Duty Air Force Captain (O-3).

25.     Both Plaintiff-Victim and Defendant were married.

26.     For the TDY at Fort Drum, Plaintiff-Victim was lodging at the Holiday Inn Express & Suites Watertown–Thousand Islands, located at 1290 Arsenal St., Watertown, NY, 13601. Other members of the unit, including Defendant, were also lodging at this hotel.

27.     On August 12, 2017, Plaintiff-Victim, Defendant, and other members of their unit went to dinner near the hotel. After dinner, Plaintiff-Victim, Defendant, and two others went to a local bar for additional drinks.

28.     At that bar, Defendant flirted with Plaintiff-Victim, at one point putting his hand down the back waistband of her pants without Plaintiff-Victim's solicitation. Plaintiff-Victim removed Defendant's hand and did not return the flirtations.

29.     The group returned to their hotel together in a cab, and each person went to their separate rooms.

30.     In her room alone, Plaintiff-Victim began preparing for sleep so she would be ready for the next day's training, including by changing into her sleep shirt. She was not intoxicated. She did not invite Defendant to her hotel room, nor did she tell Defendant which room she was in.

31.     As Plaintiff-Victim prepared for bed, nothing about the evening suggested that she was in danger.

32.     Plaintiff-Victim was unaware that Defendant had gone to the hotel front desk clerk and received her room number from them. Defendant went to Plaintiff-Victim's room and beat on the door, without identifying himself.

33.     Plaintiff-Victim was already in bed. Her room was silent and dark. But the sudden pounding roused her. The pounding on the door was aggressive and insistent, causing her fear and confusion.

34.     Plaintiff-Victim approached the door believing there might be an emergency. Unsure of who was there, she cracked open the door.

35.     When Plaintiff-Victim saw Defendant at her door, she opened it more, thinking there was something wrong that might have needed her attention.

36.     Plaintiff-Victim did not invite Defendant into her room. Nonetheless, Defendant entered, brushing Plaintiff-Victim aside.

37.     At no point did Plaintiff-Victim consent to Defendant entering her room.

38.     At no point did Plaintiff-Victim consent to physical or sexual contact.

39.     Once inside the room, Defendant proceeded to rape Plaintiff-Victim.

40.     During the attack, Defendant stated to her: "You know you want this." Afraid, Plaintiff-Victim was unable to voice anything in response.

41.     Immediately following the attack, Plaintiff-Victim rolled to the side to escape Defendant. She went straight to the bathroom and locked herself inside.

42.     Plaintiff-Victim was in the bathroom sobbing and bleeding, while Defendant knocked on the door. Plaintiff-Victim did not answer. Defendant left the room.

43.     The violence of the rape and physical assault inflicted immediate physical injury and initiated a cascade of lasting medical and emotional harm. After the rape, it was several days before Plaintiff-Victim could sit comfortably again without pain.

44.     In addition to immediate emotional trauma, Plaintiff-Victim suffered vaginal tearing, resulting in bleeding.

45.     Plaintiff-Victim also suffered bruising in her vaginal area and around her body from the attack.

46.     Following the rape, Defendant continued to contact Plaintiff-Victim and repeatedly minimized, denied, and reframed the rape as something she had wanted, and to which she had consented.

47.     Defendant exploited Plaintiff-Victim's confusion, fear, and emotional and physical distress by continuing contact and exerting influence over her in the weeks and months following the rape.

48.     Stricken with guilt and feelings of helplessness, Plaintiff-Victim continued communicating with Defendant.

49.     Subsequently, Plaintiff-Victim and Defendant began a relationship in which they did, at times, have consensual intercourse.

50.     Plaintiff-Victim felt pressured into this relationship with Defendant by his gaslighting, overbearing conduct, and previous assault of Plaintiff-Victim, which left Plaintiff-Victim traumatized and in profound fear of the Defendant.

51.     On March 2, 2018, Defendant sent Plaintiff-Victim text messages stating: "I want to kill you…Just to see how your eyes look as the life drains away."

52.     On at least one occasion, Plaintiff-Victim expressed her concerns by text message to Defendant about his behavior. For example, on February 16, 2018, Plaintiff-Victim texted Defendant: "I don't want to fuel your rage that you have towards me when I do something wrong…. How you talk to me is vicious and it hurts when get that way[.]"

53.     On another occasion, on June 18, 2018, Defendant threatened to send certain pictures Plaintiff-Victim had shared with him to others in the squadron and to "post your pictures on the internet[.]"

54.     On April 15, 2018, Defendant texted Plaintiff-Victim: "For the record, don't ever lie to me again or it will turn out poorly."

55.     In May 2018, Defendant, while in Missouri, violently strangled Plaintiff-Victim, causing Plaintiff-Victim to fear for her life.

56.     Plaintiff-Victim feared for her life in that moment not only because of the violence, but also because the Defendant had previously and routinely expressed his rage toward the Plaintiff-Victim, manipulating and exploiting her.

57.     Plaintiff-Victim ended the relationship immediately and terminated all communication with Defendant by July 2018.

58.     Since the attack, Plaintiff-Victim has suffered from crippling anxiety and depression that has manifested as PTSD (post-traumatic stress disorder). Her anxiety, depression,

and PTSD have combined into difficulty trusting others, personally and professionally. Though she has consistently engaged in therapy, she continues to suffer from persistent, debilitating panic attacks and nightmares that impact her personal and professional functionality on a day-to-day basis.

59.    The emotional damage also affected Plaintiff-Victim's career.

60.    Plaintiff-Victim left the military in 2019, and, in 2020, she left full-time policing and transitioned to Reserve Policing because she was struggling with her mental health. By October 2022, Plaintiff-Victim also left Reserve Policing for the same reasons.

61.    After Plaintiff-Victim reported Defendant to the military authorities for his sexual assault and rape of the Plaintiff-Victim in August 2017, Defendant began to harass Plaintiff-Victim, further traumatizing her.

62.    For example, on or about December 25, 2020, Defendant sent Plaintiff-Victim a picture of his children, and indicated to Plaintiff-Victim that because of her report, they would suffer because of the attendant damage to Defendant's life and career.

63.    In early 2021, Defendant also began following Plaintiff-Victim.

64.    Defendant tailed Plaintiff-Victim in his vehicle on multiple occasions and would also "accidentally" run into Plaintiff-Victim on base.

65.    Plaintiff-Victim was offered a full-time Air Force Reserve position at Whiteman AFB, but she declined because the Defendant was stationed at Whiteman AFB at the time.

66.    Eventually, the Plaintiff-Victim left policing entirely because she felt that if she could not protect herself, she could not protect others, either.

67.    The combined stresses from the aftermath of the attack have led to Plaintiff-Victim seeing multiple medical and mental health specialists, and being prescribed trazodone, lorazepam,

and Lexapro, Bupropion, Lamotrigine, Sertraline, Hydroxyzine, and Vraylar to deal with the attendant trauma associated with her assault and rape.

68. Plaintiff-Victim has been hospitalized for acute mental health crises stemming from the rape.

69. Plaintiff-Victim is listed as a disabled veteran by the Department of Veterans Affairs. She has a diagnosis of service-related PTSD/Military Sexual Trauma, rated at 70 percent disabling as of May 25, 2025, from the attack in 2017.

## LEGAL CLAIMS

### COUNT I: Assault (Rape)

70. Plaintiff-Victim incorporates by reference, repeats, and re-alleges all foregoing paragraphs, including jurisdictional allegations, as if fully set forth herein.

71. On the night of August 12, 2017, in Watertown, New York, just outside Fort Drum, Defendant entered Plaintiff-Victim's hotel room and placed Plaintiff-Victim in immediate apprehension of harmful and offensive contact, including imminent threat of forcible rape, thereby committing assault under New York law.

72. Under New York law, a "civil 'assault' is the intentional placing of another in apprehension of imminent harmful or offensive contact." *Romanac v. Town of Cheektowaga*, No. 17-CV-334S, 2021 U.S. Dist. LEXIS 23959, at \*25 (W.D.N.Y. Feb. 5, 2021), citing *Doe v. Alsaud*, 224 F. Supp. 3d 286, 294 (S.D.N.Y. 2016).

73. To sustain a claim for assault, "there must be proof of physical conduct placing Plaintiff-Victim in imminent apprehension of harmful contact." *Holtz v Wildenstein & Co., Inc.*, 261 AD2d 336, 693 NYS2d 516 [1st Dept 1999].

74. On the night of August 12, 2017, Defendant went to Plaintiff-Victim's room without invitation.

75. Once inside Plaintiff-Victim's room, Defendant commenced a physical assault and rape of Plaintiff-Victim.

76. Thus, Defendant's conduct intentionally placed Plaintiff-Victim in reasonable fear and apprehension of imminent harmful and offensive contact.

77. Plaintiff-Victim was aware of Defendant's impending harmful contact as soon as he entered her room without permission, and she reasonably apprehended that Defendant was about to inflict immediate physical harm upon her.

78. Defendant's assault on Plaintiff-Victim was the direct and proximate cause of her physical, emotional, and psychological injuries.

79. Defendant's reprehensible conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff-Victim's rights, entitling Plaintiff-Victim to an award of punitive damages, in addition to compensatory damages. *Dupree v. Giugliano*, 20 N.Y.3d 921, 924 (2012).

## COUNT II: Battery (Rape)

80. Plaintiff-Victim incorporates by reference, repeats, and re-alleges all foregoing paragraphs as if fully set forth herein.

81. On the night of August 12, 2017, Defendant committed battery against Plaintiff-Victim by raping her.

82. Under New York law, "a 'battery' is an intentional wrongful physical contact with another person without consent." *United National Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993).

11

83. Battery is established by even "the slightest unlawful touching." *Waterfront*, 994 F.2d at 108.

84. Defendant entered Plaintiff-Victim's hotel room and forcibly raped her by engaging in non-consensual sexual penetration.

85. This violent conduct caused severe physical injury, including long-term bleeding and immediate tearing, thus constituting harmful and offensive contact.

86. Plaintiff-Victim did not consent to any physical contact with Defendant, or to sexual intercourse or penetration of any kind.

87. Defendant intended to cause wrongful physical contact.

88. The injuries that followed from the battery – including genital trauma, and hemorrhaging – stemmed directly from Defendant's rape of Plaintiff-Victim.

89. As a direct and proximate result of Defendant's battery, Plaintiff-Victim suffered severe physical injuries, profound psychological trauma, and economic damages, including but not limited to emergency medical care, gynecological surgery, and ongoing mental-health treatment.

90. Plaintiff-Victim's trauma also had a dramatic impact on her career and earning potential, preventing her from pursuing her passion for military service and law enforcement, and limiting her career options in other fields.

91. Plaintiff-Victim is thus entitled to compensatory and punitive damages.

### COUNT III: Intentional Infliction of Emotional Distress

92. Plaintiff-Victim incorporates by reference, repeats, and re-alleges all foregoing paragraphs as if fully set forth herein.

12

93.     In New York law, the tort of intentional infliction of emotional distress has four elements: 1) extreme and outrageous conduct; 2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; 3) a causal connection between the conduct and injury; and 4) severe emotional distress. *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993).

94.     Defendant's conduct – violent invasion of Plaintiff-Victim's hotel room against her will, forcible sexual violence without her consent causing genital tearing and devastating reproductive harm – was both extreme and outrageous, transcending "the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Hughes v. Patrolmen's Benevolent Association*, 850 F.2d 876, 883 (2d Cir. 1988) (internal citations omitted).

95.     Defendant intended to cause, or acted with reckless disregard of causing, severe emotional and bodily trauma.

96.     Plaintiff-Victim suffered severe and enduring emotional distress, including terror, invasive surgical intervention, debilitating depression and anxiety, and profound psychological and emotional trauma requiring long-term mental health care.

97.     Defendant's violent conduct was the direct and proximate cause of Plaintiff-Victim's injuries and damages.

98.     Punitive damages may be awarded where, as is the case here, a defendant's actions were "'malicious,' 'inspired by ill will,' or in 'wanton and reckless disregard of the Plaintiff-Victim's rights," and are reserved "for the most offensive conduct." *Hughes*, 850 F.2d at 883.

99.     Plaintiff-Victim is therefore entitled to compensatory damages, medical damages, emotional damages, and punitive damages.

## JURY DEMAND

100.    Plaintiff-Victim demands a jury trial on all triable issues.

13

## **<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff-Victim respectfully requests that this Court enter judgment in her favor and against Defendant, and award the following relief:

a. Compensatory damages for past medical expenses related to medical, surgical, and reproductive-health injuries surrounding emergency care, gynecological intervention, infertility evaluation and treatment, and corrective surgeries arising from the violent assault, in an amount no less than $750,000; and,

b. Compensatory damages for future medical expenses including, but by no means limited to, gynecological intervention and corrective surgeries arising from the violent assault, in an amount no less than $750,000; and,

c. Compensatory damages for psychological trauma including but not limited to diagnosed PTSD, anxiety, and depression, in an amount no less than $1,000,000; and,

d. Emotional-distress compensatory damages for pain and suffering, in an amount no less than $750,000; and,

e. Punitive and exemplary damages, based on the Defendant's willful, wanton, malicious, and morally reprehensible conduct, in an amount no less than $750,000; and,

f. Economic damages, including lost earning capacity, therapy costs, medical travel, and out-of-pocket losses, in an amount no less than $1,000,000; and,

g. Pre- and post-judgment interest, to the fullest extent permitted by New York Law; and,

h. Costs and disbursements of this action, including filing fees and recoverable litigation expenses; and,

i. A grant of any other further relief as this Court may deem just and proper.

Dated June 8, 2026.                              Respectfully submitted,

*/s/_Dylan Thayer*

Dylan Thayer

DC Bar No. 90015821
Law Offices of Dylan T. Thayer, PLLC
5350 MacArthur Boulevard, NW
Washington, DC  20016
Tel: 240.620.9640.
dtthayer@thayeradminlaw.com

*Attorney for Plaintiff-Victim*